IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 29, 2022

**ANTHONY LEE MOOSMAN v. STATE OF TENNESSEE**

**Appeal from Criminal Court for Sullivan County**
**No. C71422    William K. Rogers, Judge**

---

**No. E2021-00639-CCA-R3-PC**

---

The petitioner, Anthony Lee Moosman, appeals the denial of his petition for post-conviction relief, which petition challenged his guilty-pleaded convictions of first degree murder, attempted first degree murder, especially aggravated burglary, attempted aggravated robbery, aggravated assault, and unlawful carrying of a weapon, alleging that he was deprived of the effective assistance of counsel and that his guilty pleas were not entered knowingly and voluntarily. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Kenneth E. Hill, Kingsport, Tennessee, for the appellant, Anthony Lee Moosman.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Barry Staubus, District Attorney General; and Andrea Black, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 27, 2018, in a consolidated plea hearing, the petitioner pleaded guilty in case number S67983 to the first degree murder of Steven Caudill, the attempted first degree murder of Clayton Ray, the especially aggravated burglary of Mr. Ray's home, the attempted aggravated robbery of Mr. Ray, the aggravated assault of Ashley Dinsmore, and the unlawful carrying of a weapon. For these convictions, he received an effective life sentence. In case number S69350, the petitioner pleaded guilty to one count of assault against Bradley Worley, and the trial court imposed a sentence of 11 months and 29 days to be served concurrently with the life sentence in case number S67983. In case number

S69052, the petitioner pleaded guilty to one count of filing a false report, for which he received a four-year sentence also aligned concurrently with the life sentence in case number S67983. Finally, the trial court held a brief hearing on an alleged probation violation,[1] and the petitioner admitted that he violated the terms of his probation. In light of the petitioner's guilty pleas, the State dismissed case number S70390, noting that the case had "not made it to the grand jury yet."[2]

The parties stipulated that, had case number S67983 gone to trial, the evidence would have established

> that on February the 20[th], 2017, officers from Kingsport were called to 391 Lyn Avenue which is in Kingsport and in Sullivan County. The proof would further be that that was the residence of Clayton Ray.
>
> . . . .
>
> They met with Ashley Dinsmore who had been in that apartment when the [petitioner] . . . had entered that apartment. . . . . [A]t a point in time while she was there, the [petitioner] entered or came to the door of that apartment with a handgun, and that [sic] made threats and asked for money from — from Mr. Ray and — Steven Caudill.
>
> Mr. Caudill was . . . seated on the couch. Mr. Ray was in the apartment as well.
>
> [T]he [petitioner] was pointing the pistol at both those two individuals, and also at some point in time at Ms. Dinsmore. She would testify that she was in fear of receiving serious bodily injury as a result.
>
> . . . [A]t some point in time . . . [Ms. Dinsmore] was able to — to leave the apartment, and shortly thereafter she heard gunfire from the apartment and — and saw the — the [petitioner] leaving the apartment.

---

[1]     Because the record is devoid of any probation violation reports, it is unclear for what convictions the petitioner was on probation.

[2]     It appears from the record that the State was preparing to charge the petitioner with attempted escape from custody.

The proof would be that — through Mr. Ray and other witnesses, that the [petitioner] opened fire, striking Mr. Caudill in the chest and striking him several times. I believe the autopsy stated that he . . . had received four various gunshot wounds, and that he — once the medical personnel arrived at the scene, found that he was deceased.

The proof would further be . . . that Mr. Ray was also shot by the [petitioner], and . . . that he sustained injuries and had to receive treatment as well.

The State's proof would further be that — that the [petitioner] left the scene. Proof would be that he was apprehended later and gave a statement to the officers that placed himself at the scene firing the weapon at . . . the two individuals, Clayton Ray and Steven Caudill.

. . . .

. . . . At the time . . . that this took place the [petitioner] had previously been convicted of the felony of burglary.

The parties stipulated that the facts as to case number S69052 would have established "that on January 9, 2018, the [petitioner] was incarcerated. That he struck and injured Officer Bradley Worley while incarcerated. And that that occurred in the Sullivan County jail here in Blountville and here in Sullivan County." The State indicated that it was relying on the facts as stated in the affidavit of complaint in case number S69052 to establish what the evidence would have proved at trial.[3]

In May 2019, the petitioner filed a pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, alleging that his guilty pleas were based on the State's use of a coerced confession, that his guilty pleas were unlawfully induced and were neither voluntary nor knowing, that his convictions resulted from a violation of his privilege against self-incrimination, and that he received the ineffective assistance of counsel.

At the April 2021 evidentiary hearing, the petitioner testified that he pleaded guilty in case number S67983 to the underlying convictions, including first degree murder for a "life" sentence. He was represented in that case by trial counsel and assistant trial

---

[3]    A copy of that affidavit is not included in the record on appeal.

counsel. He said that he asked counsel to move to suppress his pretrial statement "[b]ecause I never said none of it" and because, at the time of the statement, he "was under the influence of Xanax and I was suicidal." He said that counsel told him that his statement "don't really mean nothing" and would not "affect any of the trial outcome" and that, to his knowledge, counsel never moved to suppress the statement.

The petitioner recalled that trial counsel discussed the charges against him and explained the potential sentences. He said that when he asked how long a life sentence was, assistant trial counsel replied: "25, 52, and I don't know." He said that he entered into the plea agreement with the understanding that a life sentence was 25 years. He acknowledged that he did not ask for clarification of the term of the life sentence. The petitioner said that he ultimately decided to plead guilty because "to my understanding, it was only 25 years and I could do that in my head and I was depressed. Got tired of sitting in the county jail where I was being treated unfairly so I was ready to go to prison." He acknowledged that counsel reviewed the plea form with him but said that "[t]hey just explained the charges and that I was going to be signing a life sentence."

During cross-examination, the petitioner explained that he asked about the length of a life sentence on three separate occasions and that counsel gave him three different answers: "25[,] 52[,] and I don't know." He said that when he asked his counsel whether "they thought we could win, they said no." He reiterated that in all of his discussions with his counsel, they repeatedly told him that he would receive a life sentence for a first degree murder conviction but that no one ever explained to him that the life sentence was more than 25 years. The petitioner explained that he had told counsel during plea negotiations that he would be willing to accept a plea deal for a 25-year sentence. Because he believed a life sentence to be 25 years, he thought that pleading guilty to the first degree murder charge "was just another way to get what I wanted."

The petitioner said that on the same day that he "sign[ed] my plea," he signed an "acknowledgment form" that said that counsel had ceased plea negotiations with the State because the petitioner had instructed them to, but he noted that the acknowledgement referred to the sentence only as a life sentence and did not state "a number" of years. He asserted that his counsel told him that the sentence for attempted first degree murder was 25 years. He acknowledged that counsel told him that the three sentencing options for a first degree murder conviction were life, life without the possibility of parole, and death.

On redirect examination, the petitioner reiterated that, at the time he entered his guilty pleas, he did not know that a life sentence was 60 years.

Trial counsel testified that he and the then district public defender discussed the charges with the petitioner and explained to him all the lesser-included offenses and

"what the penalties were for each of those things." He said that they "explained to him that a life sentence was a minimum of 52 years and that life without [parole] meant . . . that you would live the rest of your natural life in prison" without the possibility of parole. He recalled that the petitioner "told me over and over [that] he wanted us to go to trial so he could get the death penalty because he didn't want to go to prison." Trial counsel explained to the petitioner that "even if he was given death[,] he was still going to be in prison for probably you know 20 or 30 years before he would ever be executed."

Trial counsel said that while he was in plea negotiations with the State and while he was preparing a motion to suppress the petitioner's statement, the petitioner "told me I want to plead guilty there's no purpose for filing the motion to suppress." Trial counsel said that the State offered a plea agreement for a life sentence and that he explained to the petitioner that a life sentence was 52 years. Trial counsel said, "I had even at one time given him a copy of that chart that's in the back of the court handbook that has ranges and sentencing and all those things." He said that he and the petitioner discussed a counter offer that would include the petitioner's pleading guilty to second degree murder for a 25-year sentence. He said that the petitioner was frustrated with how slowly things were progressing, saying, "He wanted things to move along quicker or in the alternative, he wanted his court date moved up."

Trial counsel said that assistant trial counsel joined the case after he and the petitioner discussed the counter plea offer. After the petitioner called trial counsel and told him, "I want to take the plea the [S]tate offered," trial counsel and assistant trial counsel met with the petitioner and "talked to him about what that meant specifically [and] what a life sent[ence] would mean for him." Trial counsel said that he told the petitioner that a life sentence would be 52 years, and they discussed how old the petitioner would be when he would be released. Trial counsel said that the petitioner told him, "'If I serve anything less than life and I come out of prison[,] I'll be a convicted murderer and I'll never be able to get a job. I'll never be able to fit into society.'" "His exact words were 'They're going to be flying cars around and all kinds of shit and I won't have any idea how to fit in, I'm better off spending the rest of my life in prison.'" Trial counsel acknowledged that he mistakenly identified first degree murder as a Class A felony on the plea agreement form but said, "[T]hat is not how I explained it to him." Trial counsel said that the petitioner "was insistent that he wanted to spend the rest of his life in prison and one of the reasons he wanted to plea was that the Sullivan County Jail was so bad he wanted to get out of here as quickly as possible."

Trial counsel said that he advised the petitioner that "he was making a mistake" and that he believed that he could negotiate a plea agreement for a 25-year sentence. He also told the petitioner that he thought that he had a chance of being convicted only of second degree murder at trial, which would result in "a much reduced sentence,"

-5-

but the petitioner "told us he did not want less than that because he would be an old man and he would not be able to get a job, he would not be able to assimilate into society and all those kind of things." Trial counsel told the petitioner that if he received a 25-year sentence, "he would have been younger than I am now . . . when he got out . . . but he wouldn't hear of it." Trial counsel prepared an acknowledgment statement for the petitioner to sign, which statement said that trial counsel "thought he was making a mistake taking the State's offer." Trial counsel said that he knew that the petitioner "would have second thoughts after he got to prison and I was trying to protect myself and [assistant trial counsel]" and that "I also had hoped that by having [the petitioner] read and sign this and I read it to him that it would . . . make him understand how strongly I felt about him taking the life sentence. That I thought he was making a mistake." He said that both he and assistant trial counsel "tried to talk him out of it." The petitioner and both attorneys signed the acknowledgement form the same day as the plea agreement.

When asked whether he ever told the petitioner that a life sentence was 60 years, trial counsel said, "[T]he sentence would be 60 years with the possibility of parole. You don't serve it at 100% you have to serve 52 years before you are eligible for release and that may have been where that number came in." Trial counsel said, "[N]ever never did I tell [the petitioner] that [a] life sentence was 25 years. I mean that's not, there's no way."

During cross-examination, trial counsel explained that he told the petitioner that a life sentence was 52 years because "the 52 years is what he'd have to serve before he is eligible for parole." Counsel acknowledged that the statute provided for a 60-year life sentence and that petitioner would not be guaranteed to be released in 52 years. Counsel recalled that he told the petitioner that he would be eligible for release in 52 years and that he discussed with the petitioner "the reality of what that much time would be like in prison," and the petitioner "said to me several times he didn't ever want to leave, he didn't ever want to get out of prison." He reiterated that the petitioner was concerned with his being "able to assimilate back into society if he got less than life."

Trial counsel testified that he did not make an official counter plea offer to the State because he was waiting for the petitioner to decide whether he wanted to make such an offer. Counsel said that although he had not made a formal counteroffer to the State, he had talked to the prosecutor, asking, "'Do you think you could accept something less than life?'" Before making a counteroffer or further negotiating with the State, the petitioner decided that he wanted to plead guilty to first degree murder and "take the life [sentence] because he would have no life if he got out." Counsel reiterated that the petitioner pleaded guilty against his advice. Counsel recalled that during the plea submission hearing, the trial court told the petitioner that he would receive a life sentence.

-6-

Assistant trial counsel testified that while the petitioner was in jail awaiting trial, he garnered several new charges, including for attempted escape, assault, and making a false report. Assistant trial counsel explained to the petitioner that his "continued offenses decrease our leverage . . . with the State" in plea negotiations. He recalled that in discussions of a life sentence, the petitioner was told

> [t]hat life had three outcomes. Life with parole, life without parole[,] and death. Life with parole is 52 calendar years before you are eligible for parole. Life without parole means quite frankly you die in prison and . . . if you get the death penalty[,] . . . at some point, the State of Tennessee executes you.

He denied that they ever discussed a life sentence being 25 years, noting that "the current state of the law for decades, previous to [the petitioner's] offense date was life with parole was 52 calendar years."

Assistant trial counsel said that the petitioner wrote a letter to the trial court, indicating "that he wanted a resolution somehow sooner rather than later. Whether that be a plea agreement whether that be a jury trial. He was just getting very[,] very impatient." He said that when trial counsel told him that the petitioner "wanted to accept the offer that was life," he replied, "'Are you shitting me and [trial counsel] said no, he called me and he wants to take it.'" The two attorneys then went to the jail to discuss the matter with the petitioner. During that conversation, they "discussed the possibility of . . . [s]econd [d]egree [murder] and 25 years as it pertained to the [s]econd [d]egree [m]urder charge." Assistant trial counsel believed that "we weren't getting a full acquittal at trial" but that "we had a very good case to make for [s]econd [d]egree [m]urder," and he "discussed with [the petitioner] the difference between 25 and 52 years and that that is a very large number." The petitioner, nonetheless, "indicated that he had no desire to [sic] anything less than life in prison."

During cross-examination, assistant trial counsel acknowledged that he "would not have" told the petitioner that a life sentence was 60 years.

On rebuttal, the petitioner testified that his release eligibility date as calculated by the Department of Correction was November 23, 2078, which, he said, was 60 years.

On rebuttal, trial counsel testified that an inmate receives a report, indicating their release eligibility date every three months and that the release eligibility date may change "as behavioral credits are earned."

In its written order denying post-conviction relief, the post-conviction court accredited the testimony of trial counsel and assistant trial counsel over that of the petitioner, and specifically noted that it did "not find the testimony of [the p]etitioner to be credible." The court found that "the [p]etitioner knew that he was pleading to First Degree Murder which carried a minimum of 52 years." The court concluded that the petitioner failed to establish that counsel performed deficiently.

In this timely appeal, the petitioner reasserts his argument that his guilty plea was unknowing and involuntary because counsel failed to inform him that a life sentence was 60 years.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and

-8-

used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Here, the petitioner has failed to establish that he is entitled to post-conviction relief. The record supports the post-conviction court's finding that the petitioner knew that a life sentence would require him to serve a minimum of 52 years. The accredited testimony of trial counsel and assistant trial counsel established that they repeatedly told the petitioner that a life sentence was a minimum of 52 years and that they advised the petitioner not to plead guilty to first degree murder. The Code provides that a person convicted of first degree murder "shall serve one hundred percent (100%) of sixty (60) years *less sentence credits earned and retained*. However, no sentence reduction credits . . . shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%)." T.C.A. § 40-35-501(h)(2) (emphasis added). Because a life sentence of 60 years may be reduced by as much as 15 percent through sentence reduction credits, counsel did not perform deficiently by telling the petitioner that a life sentence would require him to serve a minimum of 52 years before becoming eligible for release. *See Christopher A. Williams v. State*, No. W2013-00555-CCA-R3-HC, slip op. at 2 (Tenn. Crim. App., Jackson, Sept. 30, 2013), ("[T]his court has observed that the phrase 'life with parole' is inaccurate because a defendant sentenced to life is entitled 'to be released, as opposed to being paroled, after serving 100 percent of [60] years less any eligible credits so long as they do not operate to reduce the sentence by more than 15 percent, or nine years[.]'" (quoting *State v. Kermit Penley*, No. E2004-00129-CCA-R3-PC, slip op. at 4 (Tenn. Crim. App., Knoxville, Nov. 1, 2004)). Consequently, the petitioner has failed to establish that counsel performed deficiently.

Accordingly, the judgment of the post-conviction court is affirmed.

-9-

_____
JAMES CURWOOD WITT, JR., JUDGE